1 | Andrea L. Murray
Debtor/Defendant in Pro Per
2 | P. O. Box 3155
Chatsworth, CA 91313
3 | Telephone: (818) 456 –0560
Email; BCR2003@AOL.COM
4

5 | **UNITED STATES BANKRUPTCY COURT**

6 | **CENTRAL DISTRICT OF CALIFORNIA**

7 | **SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| 8    In re | Case No. 1:21-bk-11781-MT |
| 9    ANDREA LYNN MURRAY, | Chapter 7 |
| 10         Debtor. | Adv No. 1:22-ap-01010-MT |
| 11 | **DEBTOR-DEFENDANT ANDREA LYNN MURRAY'S DECLARATION IN SUPPORT OF MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MSJ AND STATEMENT OF FACTS** |
| 12    THE PEOPLE OF THE STATE OF CALIFORNIA, by and through GEORGE GASCÓN, Los Angeles County District Attorney, COUNTY OF LOS ANGELES and LOS ANGELES COUNTY DEPARTMENT OF PUBLIC HEALTH ACTING AS THE LOCAL ENFORCEMENT AGENCY, | |
| 13 | |
| 14 | |
| 15 | |
| 16         Plaintiffs, | Hearing for Motion for Summary Judgment: <br> Date: July 8th, 2025 |
| 17       v. | Time: 1:00 p.m. <br> Place: Courtroom 302 |
| 18    ANDREA LYNN MURRAY, and DOES 1-10; |      United States Bankruptcy Court <br>      21041 Burbank Boulevard <br>      Woodland Hills, CA 91367 |
| 19 | |
| 20         Defendants | |
| 21 | |
| 22 | |

23

24

25

26      1.  I, Andrea Lynn Murray, have personal knowledge of the facts stated herein

27         and, if called as a witness, could and would testify competently thereto.

28

2. I am a sixty-two-year-old single mom. I reside with my son in a small adobe home nestled in a little over 13 acres of agricultural land at 12051 Browns Canyon Road, Chatsworth, CA 91311, in the County of Los Angeles **("The Ranch"). (EXH. 1 Master Plan pg. 31, EXH. 2 – EXH. 5)**

3. I co-own the Ranch Property with Mr. Patrick J. Flannery, **("Mr. Flannery")** in which we each possess a 50% undivided interest, but Mr. Flannery has not resided on the Ranch since 2010. (**EXH. 6, EXH. 7 PG 4 LINE 18-23**)

4. The ranch is zoned A-2 for Heavy Agriculture use and purposes because of its rugged terrain and the need for daily maintenance with heavy farm equipment. (**EXH. 1 Pg. 4-8, 13, 16-18, 20-28, EXH. 9-12**)

5. Due to the criminal court's order that no work is to be done on the property or I will be taken into custody and could face potential jail time, the ranch has not been properly maintained since November 18th, 2018, seven years ago. (**EXH. 14, EXH. 15,** )

6. Overgrown vegetation and abundant wildlife that have taken over the ranch are evidence that the materials were not hazardous and deleterious to plant life and animals. (**EXH. 2-5,  EXH. 9-12**).

7. Historically a horse boarding ranch since the 1970's, the ranch was home to many equine therapeutic programs and animal rescue adoptions beginning in 2011 until the DA's order in 2015 to dismantle horse stalls. (**EXH. 17-33, EXH. 34** )

8. From December 2016 through February 2017, storms in Southern California created dangerous conditions—flooding, mudslides, soil erosion, and washed-out roadways—on the ranch.  (**EXH. 35-38**)

2

9. The thick mud prevented safe access to or egress from the ranch, posed evacuation risks, and threatened slope stability around and behind the home. **(EXH. 1 PG. 13, 14, 17, 18, EXH. 34)**

10. The conditions on the ranch were a direct result of the multitude of compliance inspections and continual remedial projects assigned by LA County Agencies which began in 2013 and resulted in a DA's order to remove roughly 150 horse stalls and demolish more than 20 structures on the ranch. This caused the horse boarding business to close and destroyed the beautiful aesthetics of the ranch. **(EXH. 34 – 46, 49 -61)**

11. In May of 2015, my husband, Jose Tello, drafted and submitted plans to restore the ranch by constructing horse stalls and dog kennels, in the hopes of re-opening the business. The plans were approved and good for two years, however, we were kept busy with ongoing remedial projects and were not able to implement them. **(EXH. 47-48)**

12. With no horse stalls and structures to absorb the impact of the harsh torrents of rain pelting the ground and with no structures backing up against the slopes to prevent the hillside from eroding and the subsequent mudslides, the ranch became a flooded mud bath with rivers of mud washing through it, and onto Browns Canyon Road. **(EXH. 66-82)**

13. To address these hazards, Jose,  a licensed contractor, drafted plans and ordered and received only inert materials—decomposed granite ("DG"), gravel, rip-rap, broken concrete—for roadways, retaining walls, and catchment basins. No organic, hazardous, or refuse materials were ever brought to the site. **(EXH. 1 PG. 3, 4, 10, 11, 12, 18,  EXH. 83- 90)**

3

14. Jose supervised each delivery, directing placement of materials in designated areas according to his plan. DG improved traction and accessibility; rip-rap and broken bricks stabilized slopes and broken concrete created the 2' retaining walls, walkways and patios. **EXH. 1 PG. 3, 4, 10, 11, 12, 18, EXH. 91-94)**

15. The materials were used for legitimate agricultural and safety purposes consistent with the operation of a ranch on A-2 zoned property. No willful or malicious intent to harm any person or property was involved. **(EXH. 1, EXH. 95-115)**

16. I sought professional advice promptly: in August 2017, I retained Phil Sherman, P.E., to draft a conceptual grading and erosion plan with topographic maps; on January 8, 2018, I retained Dr. John Bollinger, Architect, to conduct an analysis of the materials' quantities, placement and use according to the engineered plans. **(EXH. 1. EXH. 116-117)**

17. On July 3rd, 2017 in an action brought by Mr. Flannery, Partition Action PC056142, the court ordered that the property remain in status quo condition, unaltered by the Parties, until judgment was issued. Judgment was issued on February 27, 2018. **(EXH. 120, EXH.7)**

18. In June of 2017, the Dept. of Public Health **(DPH)** ordered the removal of the materials and cited me with codes that prohibited the farm animals from defecating and urinating on the ground, among other things. These were the codes I was cited with;

   **11.60.020 – Sanitation of Premises**

   The owner of any premises shall maintain such premises in a

clean, sanitary condition free from rubbish, refuse, and other wastes at all times, except as provided by the provisions of Division 1, or other applicable laws.

I was, quite obviously, living on a ranch with lots of dirt and lots of animals. The ranch was kept clean, but not, perhaps, by residential standards applicable to city life.

### 11.15.050 Deposit of Offensive Substances Prohibited

Except as otherwise provided in this Division 1, no person shall permit the contents of any cesspool, septic tank, water close or sewer, or any sewage effluent, excrement, urine, slop water, butcher offal, market refuse, garbage, rubbish, cans, dead animals, dead fowl, or any other putrid or offensive animal or vegetable matter to remain or to be deposited or discharged upon the surface of the ground on any premises, lot, or in any building, basement, or in any public street, or into or in a manner that might contaminate any standing water, stream, hole, excavation or public place.

The NOV failed to take into account that as a fully operational ranch, I had farm animals (i.e. horses, goats, sheep, and dogs) on the premises. Although their area was kept clean, they urinated and defecated on the ground, as large animals do.

The NOV also failed to take into account that the ranch bordered the Santa Monica Conservancy's land, and as such, the ranch frequently had wild animals such as deer, coyotes, racoons, rabbits, squirrels, quail, peacocks, Bob Cats, Mountain Lions, and

occasionally bears all of which still frequent the property.

Additionally, the NOV failed to take into account that the property is located in a private, isolated area with a private road that is open to the residents only. This road runs through the front of the ranch property. **(EXH.122, 123)**

The third and final code, PRC 450015 for Operating a Solid Waste Facility without a permit, failed to take into account that Defendant was operating and maintaining a ranch on rugged A-2 property. According to John Bollinger, materials can be stockpiled for a project up until 30 days after the completion of the project. (**EXH.125)**

## 1.  The Materials Were Not Hazardous

On 6/14/2017, Inspector Jim McCarron, Hazardous Materials Specialist III with LAFD, conducted an inspection of all the materials that were stockpiled and tested for asbestos. No contaminated or hazardous materials nor asbestos were found. If they had, Defendant would have been taken into custody. **(EXH. 124, 125)**

19. Due to mandatory settlement conferences trial preparation and other litigation, I received DPH's Notice of Violation **(NOV)** on June 28th, 2017, at which time I promptly notified my attorney. My attorney was already reaching out to the Dept. of Public Works, **(DPW)** regarding a Stop Work Order **(SWO)** that had been issued on June 1, 2017. **(EXH. 7, EXH. 126-128))**

20. I appealed administrative orders promptly and attended multi-agency District Attorney **("DA")** Settlement conferences on November 1 and December 19,

2017, to clarify that the work constituted maintenance of A-2 property exempt from conditional-use permitting. **(EXH. 128)**

21. Multi-agency inspections occurred on February 12 and March 12, 2018, with me, my counsel, the Engineer, and the Architect present to demonstrate compliance and planned use of materials. Dept. of Public Works **(DPW)** inspectors later confirmed that remediation was 99% complete and canceled a scheduled hearing. **(EXH. 130.)**

22. Despite these efforts, the Local Enforcement Agency **("LEA")** issued conflicting orders—a Cease-and-Desist Order and a Corrective Action Order—calling for both removal of inert materials and cessation of all site operations, rendering compliance impossible. **(EXH. 131)**

23. The activity cited involved the maintenance of the ranch using decomposed granite, a natural, non-hazardous material. Contrary to the allegations, by the LAC Agencies and the LEA, the treatment and use of decomposed granite on A-2 property is consistent with proper agricultural maintenance and does not constitute the operation of a dumpsite. **(EXH. 1-all pages, pg 6 footnotes, EXH. 31-33, 65-66, 92-94, 97, 104EXH. 132-146.).**

24. Subsequent criminal enforcement, including the search warrant on November 28, 2018, the citation under non-existent code provisions with a notice to appear, the probationary restrictions in December 2022 and the ongoing threat of incarceration prevented me from conducting any remedial work or presenting engineered plans to agencies. **(EXH. 13, 15 & 16)**

25. All materials stocked and placed on the ranch were accurately accounted for in the "Master Plan," a 32-page report prepared by Dr. Bollinger and Mr. Sherman, including formulas for weight and volume calculations, before-and-

after photographs, and area-by-area material tables. **(EXH. 1- Tables and**

**Exec. Summary, Pg. 3,. Photos at the end, EXH. 132-146)**

26.      At no time did I operate a commercial landfill, nor did I derive any

profit from delivery of inert materials. On the contrary, I bore significant

expense for engineering, architectural, labor, equipment maintenance,

equipment rental and equipment purchase costs to ensure family and

animal safety.

27.      When Eric Morofugi, the lead inspector with the LEA appeared

at the ranch on October 11, 2018, I was surprised to see him.

Especially since he had been less that truthful about the last

inspection in August, where the engineer and the architect I

retained, walked around the property with him and the other office,

explaining in detail how the materials were used and where. I asked

Oscar Castillo to video tape our conversation this time. I asked Eric

what had happened at the last inspection because I though he and

the other officers were pretty happy.. He was supposed to tell the

officers that the property was 80% remediated and how we used

most of the materials but he didn't.  Eric said that he wanted to

make sure we had the right permits for the work we were doing. I

said that my engineer and architect said the work I was doing was

exempt and pointed to the small retaining walls. He knew that the

Agencies weren't going to grant me a permit while there was

litigation pending and he knew that Nathan Merrick had stopped

showing up for the compliance inspections, but I told him again

anyway and he acted surprised, even though he'd been at the DA

conferences with the Agencies. So, I told him I wasn't operating a

dump sight and he said, "Yeah. We know you're not with all the

work you're doing".  So, my next question was "If you know that,

why are you still coming after me ?". .He said it was because I

needed to get permits. Defendant invited the Officer in to conduct

an inspection of the work she was doing but the Officer declined.

28.

29. The LEA's inspection calculations—totaling approximately 9,155 cubic
yards—were unsubstantiated, lacked methodological rigor, and conflicted
with the detailed professional analyses of the licensed engineer and the
architect. Browns Canyon Road's narrow width also made delivery of that
volume in the reported timeframe physically implausible (EXH. 1, Page 3,
Figure 1, Figure 2)

30. I cooperated fully with all inspections and conferences, submitted engineered
plans and a 32-page detailed analysis of the materials and the work, and
operated in good faith under federal and local regulations. Conflicting

administrative actions and criminal restrictions, however, thwarted any continued compliance efforts. **(EXH.. 1, 121, 126-130)**

**31.** On October 27th, 2021, after struggling for so long, I filed for Chapter 7 Bankruptcy, case # 1:21-bk-11781-MT. and received a no-asset discharge on February 14, 2022. Two Adversary Proceedings arose out of the bankruptcy, the instant case being one of them.**(EXH. 133)**

**32.** Since the value of the ranch property was estimated to be in the range of $1.7 million, I was certain at the time of filing that there was enough equity to satisfy her creditors, Mr. Flannery's 50% interest, the mortgage of less than $200,000, and my homestead exemption of $600,000 to replace my dwelling. I believed that there would also be more than enough equity to pay for any remedial work required, if the new buyer could not. **(EXH.133)**

**33.** On December 1st, 2021, however, the LEA sent a letter to the Trustee, Nancy Zamora, stating that " a cursory review of the site indicates that it will likely cost in excess of $4,000,000 to remediate the property", which was more than twice the value of the property.  As a result the Trustee abandoned the property back to me. **(EXH. 134)**

**34.** In November of 2023, the mediator graciously granted a continuance of the mediation, stating that two things were needed in order for the parties to reach a settlement agreement; The LEA needed to identify and state what remedial work, specifically, they were requiring, and I was to find a way to pay for the work and do the work. At the close of mediation, I agreed to allow the LEA's engineers and /or experts to come onto the property to assess what work, if any, needed to be done.

**35.** I listed the ranch in December of 2023 in the hopes that either the new buyer would have the means to complete any remedial work, or, that I would be able to contribute towards any remedial work from the proceeds of the sale. **(EXH. 135)**

**36.** When I inquired as to when the LEA's engineers would like to do an onsite assessment and analysis, I was informed that the LEA was requiring me to hire an engineer to do the analysis because the LEA could not tell me what work they were requiring. The engineer I retained in 2017 passed away, so I asked for a list of engineers to contact. **(EXH. 136)**

**37.** The listing agent of the property, Robert Berry, assisted me with contacting the engineering firms. The engineers we contacted were used to working with commercial landfills that needed site remediation before selling to a developer. They did not work with properties that had a residence on them or with residential properties. In addition, they wanted to know the scope and extent of the work that the LEA was requiring, which the LEA had not made available to us yet. **(EXH. 137)**

**38.** Though there has been a lot of interest in the property from investors and developers, without the proper disclosure and directives from the LEA as to what they require from me, or from a new buyer, there are many deterrents to driving the property to sale. **(EXH. 138)**

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: June 21, 2025

Respectfully submitted,

1

2

3

4    Andrea Lynn Murray

5    Self Represented Debtor

P.O. Box 3155

6    818.456.0560

7    BCR2003@AOL.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

Andrea Lynn Murray

Self Represented Debtor

5

P.O. Box 3155

6

818.456.0560

7

BCR2003@AOL.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28